**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FREEDOM WATCH, INC, et al<br><br>       Plaintiffs,<br><br>v.<br><br>GOOGLE, INC, et al<br><br><br>       Defendants. | 1:18-cv-02030<br><br>ORAL ARGUMENT<br>REQUESTED |

## <u>OPPOSITION TO JOINT MOTION TO DISMISS AMENDED COMPLAINT</u>

    Plaintiffs Freedom Watch, Inc. and Laura Loomer (collectively "Plaintiffs") submit the following in opposition to Defendants' Google, Inc. ("Google"), Facebook, Inc. ("Facebook"), Twitter, Inc. ("Twitter"), and Apple, Inc.'s ("Apple") (collectively "Defendants") Joint Motion to Dismiss Amended Complaint. ECF No. 29.

Dated: February 11, 2019           Respectfully submitted,

                                      */s/ Larry Klayman*
                                        Larry Klayman, Esq.
                                        Chairman and General Counsel
                                        FREEDOM WATCH, INC.
                                        D.C. Bar No. 334581
                                        2020 Pennsylvania Ave. NW, Suite 345
                                        Washington, DC 20006
                                        Tel: (310) 595-0800
                                        Email: leklayman@gmail.com

                                        Attorney for Freedom Watch, Laura Loomer, and the Class

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................1

STATEMENT OF RELEVANT FACTS ....................................................................................1

LEGAL STANDARD.................................................................................................................5

    Fed. R. Civ. P 12(b)(1) Standing ........................................................................................5

    Fed. R. Civ. P 12(b)(6)........................................................................................................6

LEGAL ARGUMENT................................................................................................................7

    Plaintiffs Have Standing to Pursue Claims ........................................................................7

        Freedom Watch ...............................................................................................................7

        Laura Loomer ..................................................................................................................8

    First Amendment Claims .....................................................................................................9

    Sherman Act.......................................................................................................................12

        Section 1.........................................................................................................................12

        Section 2.........................................................................................................................14

    The Amended Complaint States Causes of Action Under the DCHRA...................................15

        Plaintiffs Pled Unlawful Discrimination.......................................................................15

        Public Accommodation..................................................................................................16

    Plaintiffs' Claims Are Not Barred By Section 230 of the CDA ...............................................18

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................... 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585 (1985) .............................. 14, 15

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75
(D.D.C. 2003) ...........................................................................................................7, 12, 13

*Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018) .........................................................18

*Carparts Distribution Ctr. v. Auto. Wholesaler's Ass'n*, 37 F.3d 12 (1st Cir. 1994) ...................17

*City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20 (D.D.C. 2007)...........................14

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (U.S. 2013).......................................................5

*Davis v. FEC*, 554 U.S. 724 (U.S. 2008) ................................................................................6

*Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251 (S.D.N.Y. Dec. 20, 2017) .............17

*Denver Area Educ. Telcoms. Consortium v. Fcc*, 518 U.S. 727 (1996) .......................................10

*Fed. Trade Com. v. Lukens Steel Co.*, 454 F. Supp. 1182 (D.D.C. 1978) ....................................12

*Gordon v. United States Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015) ......................................6

*Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300 (2d Cir. 2018) .............................10, 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................6

*Monsanto Co. v. Geertson Seed Farms*, 177 L. Ed. 2d 461 (U.S. 2010)...................................5, 6

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) ................................6

*National Federation of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015)....................17

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ....................................................9, 10, 11

*Reno v. American Civil Liberties Union*, 521 U. S. 844 (1997) ..................................................10


**Statutes**

Fed. R. Civ. P 12(b)(1)............................................................................................................5

Fed R. Civ. P 12(b)(6)............................................................................................................6

District of Columbia Human Rights Act ................................................................15, 16, 17,18

## I.    INTRODUCTION

Plaintiffs brought this suit against Defendants, all of whom are major technology and social media corporations, in response to their well-documented and publicized pattern and practice of suppressing and censoring conservative content. The Amended Complaint sets forth in extreme detail news publications which include admissions from employees employed by Defendants that such targeted suppression and censorship was, indeed, occurring. For example, this includes admissions, inter alia, from employees of Defendant Facebook that their conduct had a chilling effect on conservative news." Am. Comp. ¶ 38.

As set forth below, Defendants' conduct violates not only the Constitution, but also numerous federal and state statutes. Defendants' status as large and influential technology corporations simply cannot shield them from liability in this regard. They must be held to the same level playing field as everyone else, and since Plaintiffs have pled viable causes of action which are supported by well pled concrete facts, Defendants' motion to dismiss must be denied.

## II.    STATEMENT OF RELEVANT FACTS

This Amended Complaint is centered upon Defendants "conspiracy to intentionally and willfully suppress politically conservative content," Am. Comp.¶ 12, and the resulting severe damages that this conspiracy has had on Freedom Watch and Ms. Loomer, both of whom are prominent conservative organizations/figures who rely on social media platforms to "to inform the public about [their] conservative advocacy and to raise the funds through donations to further its public advocacy and mission." Am. Comp. ¶ 52. The aim of this conspiracy to suppress politically conservative content is to "take down President Donald Trump and his administration with the intent and purpose to have installed leftist government in the nation's capital and the 50 states." Am. Comp. ¶ 14.

The Amended Complaint sets forth in detail how Defendants have acted to suppress and censor conservative content. For instance, YouTube, which is owned and operated by its parent company, Defendant Google, demonetized the channels of the conservative Prager University and Western Journal and also targeted conservative pundit Alex Jones of InfoWars due to their conservative political viewpoints. Am. Comp. ¶¶ 25-28. Furthermore, the Amended Complaint details how Defendant Google has censored conservative content via its search engine, with "an incredible 96% of Google search results for 'Trump' news came from liberal media outlets, using the widely accepted Sharyl Attkisson media bias chart." Am. Comp. ¶ 30.

The Amended Complaint also sets forth in detail how Defendant Facebook has censored and suppressed conservative content, including through the admissions of it former employees who admitted that they "routinely suppressed news stories of interest to conservative readers from [its] influential 'trending' news section" Am. Comp. ¶ 35. In 2018, Defendant Facebook instituted an algorithm change that further suppressed conservative content. Am. Comp. ¶ 41. According to a study by Western Journal, "Liberal publishers have gained about 2 percent more web traffic from Facebook than they were getting prior to the algorithm changes implemented in early February. On the other hand, conservative [and thus Republican] publishers have lost an average of nearly 14 percent of their traffic from Facebook." Am. Comp. ¶ 42. This is not accidental. By Defendant Facebook's own admission, Campbell Brown, the leader of Facebook's news partnerships team, admitted that Facebook would be censoring news publishers based on its own internal biases, stating:

> This is not us stepping back from news. This is us changing our relationship with publishers and emphasizing something that Facebook has never done before: **It's having a point of view**, and it's leaning into quality news. … We are, for the first time in the history of Facebook, taking a step to try to to define what 'quality news' looks like and give that a boost." Am. Comp. ¶¶ 45-46.

The Amended Complaint also sets forth how Twitter "has banned nasty accounts perceived as right-wing while ignoring similar activity from the left." Am. Comp. ¶ 49. This includes "shadowbanning" conservative accounts while ignoring radical left-wing interest groups. Am. Comp. ¶ 50.

### *Facts Pertaining to Freedom Watch*

Freedom Watch is a "a leading conservative non-profit public interest organization that operates its own website, a YouTube channel as Freedom Watch TV, a Twitter account, and Podcasts on Apple's network." Am. Comp. ¶ 51. As pled in its Complaint, Freedom Watch has and still does pay Google, Facebook, and the other defendants for "services to promote and advertise its media content in order to inform the public about its conservative advocacy and to raise the funds through donations to further its public advocacy and mission." Am. Comp. ¶ 52. Freedom Watch had been experiencing "steady growth in both audience and revenue generated through these platforms for many years," Am. Comp. ¶ 53, which suddenly and not coincidentally ceased at the time that Defendants' suppression of conservative content began, as set forth above, and grew more pronounced around the time that Special Counsel Mueller began his alleged Russian collusion investigation. *Id*. Since this conspiracy amongst Defendants to suppress conservative content began, "Freedom Watch's growth on these platforms has come to a complete halt, and its audience base and revenue generated has either plateaued or diminished." Am. Comp. ¶ 54.

The Amended Complaint details how, "[s]ince Defendants have begun suppressing and censoring Freedom Watch's content on these platforms, Freedom Watch has suffered a dramatic loss in viewership and user engagement, and this has led directly and proximately to a dramatic loss in revenue." Am. Comp. ¶ 57. For instance, Freedom Watch's YouTube channel "has

remained static and is now declining especially over the last several months, after years of steady grow[th], which simply cannot be a coincidence given the facts set forth in the previous section." Am. Comp. ¶ 55. Freedom Watch has experienced a declining number of subscribers after experiencing years of steady growth right when Defendants began suppressing conservative content. Am. Comp. ¶ 59. Crucially, the Amended Complaint alleges that these damages are "the result of the illegal and anti-competition actions as pled herein." *Id*.

### Facts Pertaining to Laura Loomer

Ms. Loomer is a well known conservative investigative journalist and activist, and a Jewish woman. Am. Comp. ¶¶ 63-64. Ms. Loomer relied heavily on social media platforms in order to perform her work as a journalist, with over 260,000 followers on Twitter as of November 21, 2018. Am. Comp. ¶ 67. In furtherance of their conspiracy to suppress conservative content, Defendant Twitter permanently banned Ms. Loomer on November 21, 2018 for the following tweet:

> Ilhan is pro Sharia Ilhan is pro- FGM Under Sharia homosexuals are oppressed & killed. Women are abused & forced to wear the hijab. Ilhan is anti Jewish. Am. Comp. ¶ 68.

Facebook also banned Ms. Loower for 30 days.  Am. Comp. ¶ 69. Ms. Loomer's tweet refers to Rep. Ilhan Omar ("Rep. Omar"), who was elected to Congress from Minnesota. Am. Comp. ¶ 70. Indeed, Ms. Loomer's tweet simply contained facts about Sharia law, which Rep. Omar is known to support. The tweet pointed out the fact that which pointed out that Rep. Omar's support of Sharia law does not make her an ally for gay people, women, or Jews. Am. Comp. ¶ 71. For instance, "[i]n Iran, Sudan, Saudi Arabia and Yemen, homosexuality is still punishable by death, under Sharia law. The same applies in parts of Somalia and northern Nigeria. In two other countries – Syria and Iraq – the death penalty is carried out by non-state actors, including

Islamic State." Am. Comp. ¶ 72. Rep. Omar herself has tweeted anti-Semitic sentiments, yet has

faced no discipline from any of Defendants' platforms:

> Israel has hypnotized the world, may Allah awaken the people and help them see
> the evil doings of Israel. #Gaza #Palestine #Israel. Am. Comp. ¶ 73.

In stark contrast, Twitter refused to take any action against openly anti-Semitic rants,

including Louis Farrakhan's referring to Jewish persons as "termites" or against known terrorist

organizations like Hamas. Am. Comp. ¶¶ 74-75. This glaring contrast has led even those who

oppose Ms. Loomer's viewpoints to harshly oppose her ban:

> That said, the line for banning someone from an open platform should be clear
> and consistent. News organizations are liable for the content they publish because
> they are specifically publishers. Open platforms are not. But if the likes of
> Facebook and Twitter are moving into the business of publishing, choosing which
> content creators they will ban and which they will lend platforms, then they
> should lawyer up and get ready to be taken to court. Am. Comp. ¶ 79.[1]

## III.   LEGAL STANDARD

### A.      Fed. R. Civ. P 12(b)(1) Standing

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and

'Controversies.' As we have explained, '[n]o principle is more fundamental to the judiciary's

proper role in our system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138,

1146 (U.S. 2013). "To establish Article III standing, an injury must be 'concrete, particularized,

and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable

ruling.'" *Id*. at 1147. As the Supreme Court has held, the "imminence" requirement for future

injury is an "elastic concept." *Id*. The Supreme Court has found Article III standing where a

---

[1] Tiana Lowe, *Twitter has banned the idiotic Laura Loomer for an innocuous tweet*, Washington
Examiner, Nov. 22 2018, available at: https://www.washingtonexaminer.com/opinion/twitter-
has-banned-the-idiotic-laura-loomer-for-an-innocuous-tweet

party merely shows a "reasonable probability" that future harm will occur." *Monsanto Co. v. Geertson Seed Farms*, 177 L. Ed. 2d 461, 466 (U.S. 2010). *See also Davis v. FEC*, 554 U.S. 724, 734 (U.S. 2008) ("A plaintiff may challenge the prospective operation of a statute that presents a <u>realistic and impending threat</u> of direct injury.") "Moreover, courts have often found probabilistic injuries sufficient to support standing." *Amnesty Int'l USA*, 133 S. Ct. at 1162. Even more, the U.S. Court of Appeals for the District of Columbia Circuit has found standing merely upon just an <u>increased risk </u>of future injury. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996). With regard to standing and injury, under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), a party at this stage need only make general factual allegations of injury resulting form Defendants' conduct

### B.      Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 8(a)(2) states that a pleading need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." When reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the court must "accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party.*" Gordon v. United States Capitol Police*, 778 F.3d 158, 163-164 (D.C. Cir. 2015).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). As such, a motion to dismiss at this stage must be decided solely on what Plaintiffs have pled in their Amended Complaint, taken as true, and not upon any factual "contradictions" that Defendants have attempted to insert.

///

6

IV.    LEGAL ARGUMENT

    A.    **Plaintiffs Have Standing to Pursue Claims**

        1.    **Freedom Watch**

Defendants assert that Freedom Watch lacks standing because its allegations are "insufficient to establish any non-speculative connection between its alleged injury and the claimed unlawful facts." ECF No. 29 at 5. This is not true. The Amended Complaint expressly alleges the injury caused by Defendants – the sudden stoppage of growth and subsequent decline after many years of continuous, steady growth. *See supra* section II. It is further alleged that this sudden stoppage of growth and decline is a direct result of the Defendants' concerted efforts to suppress and censor conservative content. Am. Comp. ¶¶ 54 – 61. Indeed, the Amended Complaint expressly alleges:

> Defendants' conspiracy to suppress conservative content has directly and proximately caused Freedom Watch significant financial injury, as well as injury in the form of suppression of speech and ideas in furtherance of its conservative public interest advocacy. Am. Comp. ¶ 61.

Furthermore, with regard to Freedom Watch's antitrust claims, Defendants misleadingly assert that Freedom Watch has not suffered an antitrust injury simply because Freedom Watch still maintains accounts with each of Defendants' platforms. However, it is clear that this is not the alleged injury. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 88 (D.D.C. 2003)

Here, the antitrust injury is shown by the fact that Defendants are refusing to provide Freedom Watch with the same level of access to its platforms as its leftist counterparts, which is

plainly anticompetitive. The Amended Complaint alleges that Freedom Watch has suffered a decline in growth as a direct result of Defendants' anti-competitive behavior. Am. Comp. ¶ 58. Indeed, the Amended Complaint specifically alleges that YouTube has "remov[ed] Freedom Watch's subscribers unilaterally." Am. Comp. ¶ 60. This is concrete, particularized anti-competitive injury and this is enough to plead standing.

What Defendants' argument appears to be is that none of the numerous reported examples of Defendants actively suppressing conservative content - which Plaintiffs pled in detail as background facts giving credence to the existence of such a conspiracy and to explain the motivations behind Defendants' conduct – directly name Freedom Watch. Yet, it is clear that just because something has not yet reported by the news does not make it untrue. The Amended Complaint clearly sets forth the alleged injury (stagnated and declining growth) as well as the causation (Defendants' concerted efforts to suppress conservative content).

Defendants' strategy, knowing full well that they have all of the evidence of their wrongdoing with regard to Freedom Watch at this stage in the litigation, is to try to make Freedom Watch "prove" their case at the pleading stage.  However, this is not the proper time for this strategy, *see supra* section III, and underscores why this case must be allowed to proceed to discovery.

### 2. Laura Loomer

With regard to Ms. Loomer, Defendants concede that she has standing to pursue claims against Defendants Twitter and Facebook, only asserting that Ms. Loomer did not make any allegations with regard to Defendants Google or Apple. However, the Amended Complaint pleads that Defendants were acting together, in concert, to suppress conservative content, such as Ms. Loomer's. As such, if there is standing as to Twitter and Facebook, there is also standing as

to the other co-Defendants and conspirators. Defendants further concede that she has suffered an antitrust injury, as they make no argument to the contrary, even conceding that Ms. Loomer alleged that her content had been suppressed. ECF No. 29 at 15.

> **B.      First Amendment Claims**

Defendants assert that Plaintiffs' claims under Section 1983 for First Amendment constitutional violations fail as a matter of law because they do not qualify as state actors capable of being sued for constitutional violations. While Courts in the past may have held in this fashion, before the now ubiquitous nature of the internet has taken hold, some courts are now finding that denying equal access to the internet <u>can</u> for the basis for constitutional violations, including the Supreme Court.

In *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court held that a North Carolina law making it a felony for a registered sex offender to access social networking sites where the offender knows that the site allows for minors to join was unconstitutional and in violation of the First Amendment.

In *Packingham*, Mr. Packingham pled guilty to "taking indecent liberties with a child." As a result, he was required to register as a sex offender, which therefore barred him from accessing commercial social media sites. *Id.* at 1734. Under a pseudonym, Mr. Packingham signed up for Facebook and made a post celebrating the fact that the state court had dismissed a traffic ticket against him. *Id*. After doing some research, the police department determined that it was Mr. Packingham who had made the post, and was subsequently indicted for violating N. C. Gen. Stat. Ann. §§14-202.5. *Id*. The lower court denied Mr. Packingham's motion to dismiss on First Amendment grounds, the appellate court reversed, and the North Carolina Supreme Court

reversed again. Finally, the Supreme Court reversed a final time, finding a constitutional First Amendment violation.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context." *Id*. at 1735. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. **It is cyberspace—the "vast democratic forums of the Internet" in general, and social media in particular**." *Id*. (emphasis added) (internal citation omitted). "In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id*. at 1735-36 (citing *Reno* v. *American Civil Liberties Union*, 521 U. S. 844 (1997)). Accordingly, the Supreme Court found that access to these social media sites could form the basis for a constitutional First Amendment issue, and after applying intermediate scrutiny, found that the statute was unconstitutional. *Id*. at 1736.

Other Courts have found that even private corporations can be held liable for First Amendment violations. *Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300 (2d Cir. 2018). In *Halleck*, the U.S. Court of Appeals for the Second Circuit found that a non-profit corporation overseeing public access channels were subject to the First Amendment. *Id*. at 301. In reaching this conclusion, the *Halleck* Court leaned heavily on the Supreme Court's decision in *Denver Area Educ. Telcoms. Consortium v. Fcc*, 518 U.S. 727 (1996). As pointed out by *Halleck*, Justice Kennedy wrote in *Denver* that "[a] public access channel is a public forum…. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas…. It is

important to understand that public access channels are public fora created by local or state governments in the cable franchise." *Halleck* 882 F.3d 305 (internal citations and quotations omitted). Relying upon Justice Kennedy's reasoning, the *Halleck* Court held that "public access channels, authorized by Congress to be "the video equivalent of the speaker's soapbox" and operating under the municipal authority given to MNN in this case, are public forums, and, in the circumstances of this case, MNN and its employees are subject to First Amendment restrictions." *Id*. at 308. This matter is currently on appeal to the U.S. Supreme Court, with a Petition for Writ having been granted on October 12, 2018 and oral arguments scheduled for February 25, 2019. Given the Supreme Court's ruling in *Packingham*, Plaintiffs believe that it is very likely that the Supreme Court will uphold the Second Circuit's decision.

While *Halleck* specifically deals with public access television, the implications on internet providers is clear as day, as they too provide the same "public forum" as public access televisions, while also being privately owned corporations. This is evidenced by the fact that internet trade associations have filed amicus briefs arguing against the *Halleck* decision.[2]

In any event, this Court should apply the sound reasoning set forth in *Packingham* and hold that Defendants can be sued under the First Amendment. In the modern era, it is clear that the Internet has overtaken physical public spaces in the traditional sense as the chosen forum for public debate and discourse, which is what the First Amendment specifically seeks to protect. Defendants must not be allowed to hide behind their status as corporations while actively suppressing and censoring content that they do not agree with, as they are the providers of ubiquitous, and essential, services that just about every single person in the nations utilizes.

///

---

[2] For instance, the Internet Association and Electronic Frontier Foundation both filed amicus briefs on December 11, 2018 arguing against the *Halleck* decision.

C.      **Sherman Act**

Defendants assert, erroneously, that Plaintiffs' claims under Section 1 and Section 2 of the Sherman Act fail as a matter of law. In doing so, Defendants conveniently omit the facts well pled in Plaintiffs' Amended Complaint, which clearly set forth viable causes of action.

1.      **Section 1**

Defendants claim that Plaintiffs claim under Section 1 fails because Plaintiffs did not allege any facts that suggest that Defendants conspired in any way. This is not true. As a threshold matter, the Amended Complaint expressly pleads the existence of an illegal, plainly anticompetitive agreement that harms competition between Defendants:

> Defendants have entered into an illegal agreement to refuse to deal with conservative news and media outlets, such as Freedom Watch and those similarly situated, as well as to suppress media content and advocacy, which has no legitimate business justification and is plainly anticompetitive. Am. Comp. ¶ 82.

The Amended Complaint sets forth the requisite "concerted action" necessary to sustain a Section 1 claim. Concerted action may be "may be proven by direct or circumstantial evidence." *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 90 (D.D.C. 2003). If circumstantial evidence is used, then there need only be "evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently." *Id.* (internal quotations omitted).

Furthermore, "[c]oncerted action" may be inferred from evidence of parallel business behavior, which in this instance is demonstrated by the fact that each of the four Defendants has acted to suppress and censor conservative content. *Fed. Trade Com. v. Lukens Steel Co.*, 454 F. Supp. 1182, 1189 (D.D.C. 1978). In this instance, in addition to parallel business behavior, there would need to be (1) evidence that the Defendants acted contrary to their economic self-interest, and (2) evidence of the Defendants' motivation to enter into an agreement. *Id.*

The Amended Complaint sets forth both the evidence that excludes the possibility of independent action, as well as the plus factors necessary for concerted action to be inferred from parallel business behavior. It alleges that Defendants acted against their own economic self-interest in their concerted action to restrain trade:

> Defendants' agreement has a plainly anti-competitive effect and has no rational economic justification, **as they are willing to lose revenue from conservative organizations and individuals like Freedom Watch and those similarly situat**ed to further their leftist agenda and designs to effectively overthrow President Trump and his administration and have installed leftist government in this district and the 50 states. Am. Comp. 84 (emphasis added).

> There is no legitimate independent business reason for Defendants "conscious parallelism," as they **are losing revenue from conservative organizations** and individuals like Freedom Watch and those similarly situated. Am. Comp. ¶ 86 (emphasis added).

Furthermore, the Amended Complaint also provides evidence of Defendants' motivations in entering into such an agreement:

> Acting in concert with traditional media outlets, including but not limited to Cable News Network ("CNN"), MSNBC, the New York Times and the Washington Post – all of whom are owned and/or managed by persons with a leftist political ideology, **Defendants have intentionally and willfully suppressed politically conservative content in order to take down President Donald Trump and his administration with the intent and purpose to have installed leftist government in the nation's capital and  the 50 states**. Am. Comp. ¶ 14 (emphasis added).

Lastly, it is clear that Defendants' illegal agreement is "unreasonably restrictive of competitive conditions." *Mesa Air Grp., Inc.*, 295 F. Supp. 2d at 92. Defendants make no argument that such an agreement to censor and suppress conservative content is not unreasonably restrictive, nor could they. Indeed, Defendants have effectively cut off the same level of access to their platforms to an overwhelming number of individuals.

///

///

### 2.       Section 2

Even without a claim for "shared monopolization," the facts set forth in the Amended Complaint support a finding of single-firm monopolization. For instance, the Amended Complaint sets forth that "Facebook has the largest market share in the United States for social networking advertising revenue, at 79.2% in 2018 thus far." Am. Comp. ¶ 88.  In fact, even Facebook's CEO, Mark Zuckerberg, struggled to name even a single competitor to Facebook during a joint session between the Senate Judiciary and Commerce committees on April 10, 2018. Am. Comp¶¶ 91-93.  Furthermore, it is pled in the Amended Complaint that Facebook is also the leading way that most Americans get their news. According to the Pew Research Center, just shy of half of all Americans get their news on Facebook – far more reach than any other social media site. Am Comp. ¶ 96.

In any event, it is clear that in addition to single firm actual monopolization, Section 2 of the Sherman Act also prohibits a conspiracy to monopolize, which necessarily involves multiple firms. Such a claim requires "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize a designated segment of commerce." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 41 (D.D.C. 2007).

In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585 (1985), the Supreme Court found a Section 2 violation where a firm operating three of four mountain ski areas in Aspen, Colorado refused to continue cooperating with a smaller rival in offering a combined four-area ski pass. In doing so the Supreme Court considered the conduct's "impact on consumers and whether it [had] impaired competition in an unnecessarily restrictive way."

Similarly, the Amended Complaint pleads that "Freedom Watch a user and consumer of Defendants' platforms, it is also a competitor, insofar as it creates its own original media content in the form of videos, articles, and podcasts and other audio media, such as radio, which are distributed via the internet in this district, and both nationwide and worldwide." Am. Comp. ¶ 62. This refusal to deal with Freedom Watch, like in *Aspen*, has no viable economic justification and is plainly anticompetitive. Am. Comp. 101, Similarly, the violative conduct of Defendants has resulted in a worse quality of services for its consumers who tend to lean conservatively and, as set forth in this Amended Complaint, lack any normal business justification. Am. Comp. ¶ 102.

### D.    The Amended Complaint States Causes of Action Under The DCHRA

#### 1.    Plaintiffs Pled Unlawful Discrimination

Defendants assert that Plaintiffs failed to plead facts establishing that Defendants engaged in unlawful discriminatory practice.

With regard to Freedom Watch, Defendants allege that "there are no facts pleaded in the Amended Complaint that support the notion that Defendants took any action against it based upon either political or religious affiliation." ECF No. 29 at 16. This is false. The Amended Complaint sets forth that Freedom Watch is a "leading conservative non-profit public interest organization that operates its own website, a YouTube channel as Freedom Watch TV, a Twitter account, and Podcasts on Apple's network." Am. Comp. ¶ 11. The Amended Complaint further sets forth, in meticulous detail, how Defendants have engaged in a conspiracy to suppress and censor conservative content. *See supra* section II. The Amended Complaint alleges that, as a direct result of this censorship and refusal to deal, Freedom Watch has suffered injury, as its "growth on these platforms has come to a complete halt, and its audience base and revenue

generated has either plateaued or diminished." Am. Comp. ¶ 54. Defendants' only defense is that Freedom Watch maintains active accounts on their various platforms, but this does not address the fact that the content contained on the platforms has been censored, and access diminished. By way of analogy, a restaurant's actions would still be discriminatory if they allow a patron in the door, but refuse to serve him food.

With regard to Ms. Loomer, it is clear she has pled facts alleging both political and religious discrimination. The Amended Complaint alleges that Ms. Loomer is both conservative and Jewish. Am. Comp. ¶ 64. She was banned from Twitter for stating facts about a liberal political candidate and Sharia law's inherent homophobic stances. On the other hand, Twitter has refused to discipline the same liberal political candidate who has made blatant anti-Semitic tweets, including accusing Jewish persons of having hypnotic mind-control powers. It has also refused to discipline Louis Farrakhan for referring to Jewish persons as termites and even worse. In sum, a scenario where conservative Jewish person was banned for tweeting undisputed facts and liberal Muslims were not disciplined for tweeting blatant anti-Semitic messages is textbook unlawful discrimination.

### 2.    Public Accommodation

Defendants next assert that online services are not places of public accommodation under the meaning of the DCHRA solely because the DCHRA only applies to physical locations. The only cases cited by Defendants in support are from 1981 and 1995, respectively, well before the Court had any occasion to determine the ubiquitous nature of internet-based service providers today. Indeed, many Courts across the nation have expressly held internet sites to be places of "public accommodation."

For instance, the U.S District Court for the Southern District of New York in *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251 (S.D.N.Y. Dec. 20, 2017) found that "[a] commercial website itself qualifies as a place of 'public accommodation' to which Title III of the ADA affords a right of equal access." *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, at *19 (S.D.N.Y. Dec. 20, 2017). *See also National Federation of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015) (holding that that Title III applied to a digital library subscription service, Scribd, accessible only via the Internet).

The First Circuit's ruling in *Carparts Distribution Ctr. v. Auto. Wholesaler's Ass'n*, 37 F.3d 12 (1st Cir. 1994) is particularly instructive. The *Carparts* Court found that "public accommodations" under the ADA were not limited to actual physical structures. In doing so, *Carparts* paid particular attention to the fact that Congress included "travel service" on its list of services considered "public accommodations," holding that "Congress clearly contemplated that "service establishments" include providers of services which do not require a person to physically enter an actual physical structure." *Id*. at 19. Tellingly, in its definition of "Place of public accommodation," the D.C. Code also lists "travel or tour advisory services" as a place of public accommodation where discrimination is not allowed. Indeed, this Court has itself expressly adopted the reasoning set forth in *Carparts*, holding:

> Title III's protections extend beyond physical access to insurance offices and prohibit discrimination based on disability in the enjoyment of the goods and services made available at a place of public accommodation. *See Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 19 (1st Cir. 1994) (finding that public accommodation "is not limited to actual physical structures" and may include access to insurance plans). *Baron v. Dulinski*, 928 F. Supp. 2d 38, 42 (D.D.C. 2013).

Lastly, any distinction that Defendants attempt to make between the ADA's definition of public accommodations and the DCHRA's definition would be a distinction without a difference.

Both statutes expressly use the same language. Both have been passed for the same purpose – to protect individuals from discrimination. As such, this Court should find that Defendants' internet platforms are places of "public accommodation" for purposes of the DCHRA.

> **E.     Plaintiffs' Claims Are Not Barred By Section 230 of the CDA**

Section 230 of the Communications Decency Act grants immunity if "[Defendant] qualifies as an interactive computer service; (2) if the complaint states that the objected-to information was provided by third party users and not [Defendant]; and (3) if the Complaint seeks to treat the Defendant as a publisher of the content." *Bennett v. Google, Inc*., 2017 U.S. Dist. LEXIS 95708, *3. Crucially, however, the U.S. Court of Appeals for the District of Columbia Circuit set forth, in no unclear terms, that "[t]he intent of the CDA is thus to promote rather than chill internet speech." *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018). The *Bennett* Court reasoned further, "Put differently, section 230 **incentivized companies to neither restrict content** nor bury their heads in the sand in order to avoid liability." *Id*. (emphasis added). As such, the D.C. Circuit has already found that the purpose of Section 230 of the CDA is not to allow interactive computer services free reign to censor and suppress content. This core principle is ingrained in the text of the statute, as the CDA recognizes that the internet offers "a forum for a **true diversity of political discourse**, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id*. at 1165 (emphasis added) (quoting 47 U.S.C. § 230(a)(3)). Censorship and suppression of political content cuts against the express language of Section 230 of the CDA.

This makes perfect sense. Where a purported "interactive computer service" is actively censoring and suppressing certain types of content, it is no longer simply providing a forum for third parties to post and share their own thoughts, opinions, and views, which is what Section

230 of the CDA was meant to rightfully protect. At this point, it is publishing its own thoughts, opinions, and views, albeit in the form of third-party content. This is a critical distinction, as this is clearly not the type of behavior that Section 230 was meant to shield.

Even those who are on the left agree whole-heartedly with this interpretation. In her article defending Ms. Loomer with regards to her ban from Twitter (while still attacking her viewpoints), Tianna Lowe of the Washington Examiner wrote:

> That said, the line for banning someone from an open platform should be clear and consistent. News organizations are liable for the content they publish because they are specifically publishers. Open platforms are not. But if the likes of Facebook and Twitter are moving into the business of publishing, choosing which content creators they will ban and which they will lend platforms, then they should lawyer up and get ready to be taken to court. Am. Comp. ¶ 79.

It is clear that Defendants here are not acting as simple "interactive computer services," but instead as publishers who are putting forth their own views, beliefs, and agendas for mass consumption. As set forth in the Amended Complaint, it is clear that Defendants are using their platforms to advance their own beliefs. Campbell Brown, the head of Defendant Facebook's news partnerships team, admitted on behalf of Facebook:

> This is not us stepping back from news. This is us changing our relationship with publishers and emphasizing something that Facebook has never done before: **It's having a point of view**, and it's leaning into quality news. … We are, for the first time in the history of Facebook, taking a step to try to to define what 'quality news' looks like and give that a boost. Am. Comp. ¶ 46.

The Amended Complaint also sets forth how Defendants Twitter and Google (through YouTube) are targeting only conservative accounts for "discipline" in order to further its own personal political beliefs and biases. *Supra* section II.

In sum, Defendants should not be afforded immunity under Section 230 of the CDA simply because of their traditional status as online platform providers. This Court must make the focus about what is actually being alleged in Plaintiff's Amended Complaint. It is clear that this

lawsuit involves Defendants' conduct as publishers of content, furthering their own viewpoints, agendas, and beliefs. As set forth by Ms. Lowe, "if the likes of Facebook and Twitter are moving into the business of publishing, choosing which content creators they will ban and which they will lend platforms, then they should lawyer up and get ready to be taken to court."

## V.   **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint and allow this matter to proceed to discovery, where further evidence of Defendants' unconstitutional and illegal conduct, in addition to what is already in the public domain and pled in the Amended Complaint, will surely be uncovered.

Plaintiffs respectfully request oral argument.

Dated: February 11, 2019                          Respectfully submitted,

                                                  */s/ Larry Klayman*
                                                  Larry Klayman, Esq.
                                                  Chairman and General Counsel
                                                  FREEDOM WATCH, INC.
                                                  D.C. Bar No. 334581
                                                  2020 Pennsylvania Ave. NW, Suite 345
                                                  Washington, DC 20006
                                                  Tel: (310) 595-0800
                                                  Email: leklayman@gmail.com

                                                  Attorney for Freedom Watch, Laura Loomer,
                                                  and the Class

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed November 28, 2018 and served to all counsel of record through the Court's ECF system.

*/s/ Larry Klayman*_____
Attorney
