UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FREEDOM WATCH, INC.** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **GOOGLE, INC.** *et al.*, <br><br> Defendants. | Case No. 1:18-cv-02030 (TNM) |

**MEMORANDUM OPINION**

This case is brought by conservative activists who allege that America's major technology firms have conspired to suppress their political views. The Plaintiffs raise non-trivial concerns. But because they have failed to tie these concerns to colorable legal claims, the Court must dismiss their Amended Complaint.

**I.**

Freedom Watch and Laura Loomer accuse Google, Facebook, Twitter, and Apple (collectively, the "Platforms") of working together to "intentionally and willfully suppress politically conservative content." Am. Compl. 4. Freedom Watch describes itself as a "conservative non-profit public interest organization." Am. Compl. 11. It operates YouTube,[1] Facebook, Twitter, and Apple accounts through which it publishes and promotes media content. *Id*. This content seeks to "inform the public about [Freedom Watch's] conservative advocacy" and to raise funds to further its mission. *Id*.

---

[1] YouTube is a video-sharing website owned by Google.

Freedom Watch "experienced steady growth in both audience and revenue generated through these platforms for many years." *Id*. at 12.  This changed, the organization suggests, following the "suppression of conservative content," which "grew more pronounced and severe . . . after the election of President Donald J. Trump." *Id*.  Freedom Watch alleges that its "growth on these platforms has [since] come to a complete halt, and its audience base and revenue generated has either plateaued or diminished." *Id*.

Like Freedom Watch, Ms. Loomer has a Facebook account. *Id*. at 16.  Until recently, she also maintained a Twitter account with over 260,000 followers. *Id*. at 14.  She describes herself as a "conservative investigative journalist and political activist," *id*. at 13, and she uses her social media accounts to "reach[] her audience with her investigative work." *Id*. at 16.  Ms. Loomer claims that Twitter banned her "permanently and without cause" after she posted a tweet about Congresswoman Ilhan Omar, a Democrat. *Id*. at 14.  After this tweet, "Facebook subsequently banned [her] for 30 days." *Id*.  Because of these alleged actions, Ms. Loomer "has and will continue to suffer severe financial injury." *Id*. at 16.

The Plaintiffs believe that the Platforms' conduct violates several laws.  First, they argue that the Platforms "have entered into an illegal agreement to refuse to deal with conservative news and media outlets . . . as well as to suppress media content and advocacy." *Id*. at 17.  This purported agreement is "evidenced by the fact that Freedom Watch began losing users on each of Defendants['] platforms at or around the same time." *Id*.  And because it has "no legitimate business justification and is plainly anticompetitive," *id*., the agreement violates § 1 of the Sherman Act. *Id*. at 20-21.

Second, the Plaintiffs contend that the Platforms have also violated § 2 of the Sherman Act. *Id*. at 22.  They have done so by "willfully" engaging in "an exclusionary course of

conduct" with a "specific intent to monopolize, and to destroy effective competition in the relevant market for media and news publications." *Id*.

Third, the Platforms have allegedly violated the District of Columbia's Human Rights Act. *Id*. at 23.  The Plaintiffs suggest that the Platforms have denied them "the full and equal enjoyment of the services, privileges, and advantages that they provide to persons which they perceive to not be affiliated with the Republican Party or of Jewish faith." *Id*.  Political affiliation and religious beliefs are both traits protected by the Act, which prohibits discrimination on these bases at places of public accommodation.  *See* D.C. Code § 2-1402.31.  Arguing that the Platforms are "public accommodations," the Plaintiffs contend that the Act covers the alleged discrimination they faced.  Am. Compl. 23.

Finally, the Plaintiffs assert that the Platforms have deprived them of their "constitutional rights by censoring [their] content for purely political reasons." *Id*. at 24.  This censorship, they assert, violates the First Amendment because the Platforms are "quasi-state actors" that "create[], operate, and control public platforms that are for public use and public benefit." *Id*.

The Platforms have moved to dismiss these claims.  They argue that the Plaintiffs lack standing to sue them.  Defs.' Mot. to Dismiss Am. Compl. ("Defs.' Mot.") at 4, ECF No. 29. They also argue that the Plaintiffs have failed to state legally cognizable claims. *Id*. at 8.  They believe that they are not subject to the First Amendment or the District's Human Rights Act, as they are neither state actors nor public accommodations. *Id*. at 8, 17.  And they contend that the Plaintiffs have failed to allege sufficiently the existence of any agreement or unilateral actions that violate the Sherman Act. *Id*. at 12-16.[2]

---

[2] The Court has diversity and federal question jurisdiction over this case. *See* 28 U.S.C. §§ 1331-32.

## II.

Whether the Plaintiffs have standing to sue is a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  Article III of the U.S. Constitution limits this Court's jurisdiction to "actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and the "concept of standing is part of this limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citation omitted).

To show standing, the Plaintiffs bear the burden of alleging an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper*, 568 U.S. at 409.  Facing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), they "must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (cleaned up).  The Court will "draw all reasonable inferences from [the Plaintiffs'] allegations in [their] favor," but it may not "accept inferences that are unsupported by the facts," "assume the truth of legal conclusions," or credit "threadbare recitals of the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The Platforms also seek dismissal for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A valid complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In evaluating a motion to dismiss, the Court must construe the complaint in the light most favorable to the Plaintiffs and accept as true all reasonable factual inferences drawn from well-pleaded allegations. *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The Court need not, however, accept legal conclusions or mere conclusory statements as true. *Iqbal*, 556 U.S. at 678. Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

### III.

### A.

The Plaintiffs have sufficiently alleged facts supporting their standing. To begin with, the Platforms do not contest Ms. Loomer's standing to sue Facebook and Twitter. *See* Defs.' Mot. at 8; Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Rep.") at 4, ECF No. 41 (arguing only that Ms. Loomer lacks standing against Google and Apple). Because Ms. Loomer has standing against Facebook and Twitter, the Court assumes for these purposes that Judicial Watch does too. *See Horne v. Flores*, 557 U.S. 433, 446 (2009) (noting that because one plaintiff "clearly has standing" to sue, the Court "need not consider whether the [other plaintiffs] also have standing to do so").

As to Apple and Google, the Plaintiffs have met their burden of establishing standing at this initial stage. This burden "grows heavier at each stage of the litigation," and, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015). In the Amended Complaint,

5

Freedom Watch alleges that the growth of its audience and revenues generated from the Platforms' platforms have "come to a complete halt." Am. Compl. 12. It states that the cause of this decline is the conspiracy to suppress their content, and that "each and every one of" the Platforms has participated in this conspiracy. *Id*. And it asserts, for example, that the "number of subscribers to Freedom Watch's YouTube channel has remained static and is now declining." *Id*.

Similarly, Ms. Loomer alleges that the Platforms banned her after suggesting that Representative Omar is in favor of Sharia law and is "anti Jewish." *Id*. at 14. She contends that, though Representative Omar "herself has tweeted anti-Semitic sentiments," she has faced "no discipline from" the Platforms. *Id*. at 15. She also notes that "Twitter refused to take any action against" Louis Farrakhan after he posted a video clip on the platform that seemingly compared Jewish people to "termites." *Id*. (citing an October 2018 article from The Hill). Because of this discriminatory behavior by Twitter and the Platforms, Ms. Loomer argues, she has "suffer[ed] severe financial injury" and has lost the ability to communicate with her followers. *Id*. at 16.

In other words, the Plaintiffs have alleged a plausible harm—a decrease in revenues—that is fairly traceable to the alleged conspiracy by the Platforms. The injunctive relief the Plaintiffs seek would prevent the Platforms from continuing the alleged suppression of the Plaintiffs' media content. Am. Compl. 25. These allegations sufficiently establish the Plaintiffs' standing to bring their claims.

**B.**

While they have established standing, the Plaintiffs have failed to state viable legal claims. Consider first their Sherman Act arguments. Section 1 of the Sherman Act states that "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the

several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Independent action is not prescribed" by § 1. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760 (1984). So a valid claim must allege that the Platforms "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id*. at 764.

The Plaintiffs' claim fails to do this. True, the Amended Complaint repeatedly states that the Platforms have engaged in a conspiracy or illegal agreement. *See, e.g.*, Am. Compl. 4, 5, 12, 17. But it offers only these conclusory statements to suggest the existence of such an agreement. It includes no allegations, for example, that any of the Platforms met or otherwise communicated an intent to collectively suppress conservative content.

Adequately stating a Sherman Act § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Merely invoking terms like "conspiracy" and "agreement" is not enough. *See id*. at 557. A "district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id*. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). That specificity is lacking here.

The Plaintiffs also suggest that the Platforms "have engaged in 'conscious parallelism' and in concert mimicked each others' refusal to deal with Freedom Watch and Ms. Loomer." Am. Compl. 21. But Freedom Watch admits that it "has and still does pay Google and YouTube, Facebook and the other Defendants for services." *Id*. at 11. This admission contradicts assertions of a coordinated "refusal to deal" with the Plaintiffs.

More broadly, "conscious parallelism [is] a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions." *Twombly*, 550 U.S. at 553. It is "not in itself unlawful." *Id*. at 554.

7

"Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id*. at 556-57.

While the Plaintiffs sufficiently alleges that each of the Platforms acted to suppress or censor conservative content, they fail to show how the Platforms' purportedly parallel actions stem from a conspiracy. The Amended Complaint asserts that the Platforms are "willing to lose revenue from conservative organizations and individuals like Freedom Watch." Am. Compl. 17. This willingness comes from a desire to "further their leftist agenda." *Id*. The Plaintiffs suggest this allegation—that the Platforms were motivated to take these actions despite losing revenue—provides enough circumstantial evidence of an antitrust conspiracy. *See* Pls.' Opp. to Mot. to Dismiss ("Pls.' Opp.") at 13, ECF No. 34.

Not so. Losing revenue from certain organizations or individuals is not necessarily against the economic interests of any of the Platforms. The Amended Complaint does not allege that the Platforms' overall profitability decreased because of their actions. A loss of income from one source can be offset by larger gains in income from other sources. And the effect of politically motivated business decisions on the net revenues of corporations is far from clear.[3] In

---

[3] Compare, for example, two news stories about Nike's decision to feature former NFL quarterback Colin Kaepernick in a new advertising campaign. In a September 5, 2018, article, CNN noted that Nike's share price declined by three percent after the launch of the campaign and suggested that "Wall Street seems to think Nike just blew it." Paul R. La Monica, *Nike Investors Aren't Happy About the Colin Kaepernick Ad*, CNN (September 5, 2018), https://money.cnn.com/2018/09/04/news/companies/ nike-stock-down-colin-kaepernick/index.html. But just a few days later, a reporter noted that Nike's shares were up about four percent since the launch and reasoned that the Kaepernick campaign "is resonating with the company's core customer base." Jonathan Berr, *Nike Stock Price Reaches All-Time High After Colin Kaepernick Ad*, CBS News (September 14, 2018), https://www.cbsnews.com/news/nike-stock-price-reaches-all-time-high-despite-colin-kaepernick-ad-boycott/.

short, the Plaintiffs' Amended Complaint presents no facts excluding the possibility that the alleged conspirators were acting alone. It therefore fails to state a § 1 claim.

The Plaintiffs' Sherman Act § 2 claim fares no better. Section 2 makes it illegal for an entity to "monopolize, or attempt to monopolize, or combine or conspire with any other [entity], to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The Amended Complaint suggests that the "Defendants collectively have obtained monopoly power in the relevant markets through exclusionary conduct that has severely harmed competition." Am. Compl. 20.

Even taking their statements as true, the Plaintiffs fail to make out a § 2 claim. As the Platforms correctly note, collective or "shared monopoly" arguments are generally "insufficient to state a claim that defendants have monopolized or attempted to monopolize the [relevant] market in violation of Section 2 of the Sherman Act." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007). *See also* Defs.' Mot. at 15 n. 7 (collecting cases holding that allegations of a shared monopoly do not state a viable § 2 claim). Indeed, the Plaintiffs apparently concede the futility of their shared monopoly claim. *See* Pls.' Opp. at 14.

The Amended Complaint also suggests that Facebook is "the leading way that most Americans get their news," and that the company "has held at least a 73.9% market share in advertising revenue since at [sic] 2015." Am. Compl. 18, 20. The Plaintiffs argue that these assertions sufficiently "support a finding of single-firm monopolization." Pls.' Opp. at 14. They do not.

First, the Amended Complaint does not allege that any of the Platforms, acting individually, has monopolized or sought to monopolize any market. Rather, its legal claims focus on the conduct of the Platforms acting together. *See* Am. Compl. 20, 22.

9

Second, even if it can be read as alleging that Facebook or one of the other Platforms has tried to monopolize a market, the Amended Complaint offers only conclusory statements in support of this argument. It defines the relevant market as the "market for media and news publications (and the submarket for political media and news publications)." Am. Compl. 20. And it states that the "geographic markets are in this district and nationwide and worldwide." *Id*.

But the Plaintiffs offer no market share data for any of the Platforms in either the local or worldwide markets for media and news publications. Instead, they make claims about the "social network global market," the "social networking advertising revenue" market, the "digital ad revenues" market, and the "mobile ad market." Am. Compl. 18. And though the Amended Complaint states that "59% of Twitter users get their news through the Twitter platform" and that "48% of all American adults [get] their news from Facebook," it offers no support for the notion that either firm has achieved or tried to achieve monopolization of the nationwide media and news publications market. Am. Compl. 20.

The Plaintiffs also argue that the Platforms conspired to monopolize the market for media and news publications. Am. Compl. 22; Pls.' Opp. at 14-15. But, as discussed above, the Amended Complaint does not adequately allege the existence of a conspiracy. Thus, this argument fails too, and the Court will dismiss the Plaintiffs' Sherman Act claims.

## C.

Turning to the Plaintiffs' discrimination claim, the Court finds that the Platforms' online services are not "places of public accommodation" under the D.C. Human Rights Act. The Act makes it unlawful to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" because of the person's political affiliation or religion. D.C. Code § 2-

1402.31(a). It defines a "place of public accommodation" as "all places included in the meaning of such terms as inns, taverns, road houses, hotels, motels . . . restaurants, . . . wholesale and retail stores," and many other physical locations. *Id.* § 2-1401.02(24). The definition includes over 50 specific examples of "places of public accommodation." Not one of these examples is an online or virtual platform.

As the D.C. Court of Appeals has made clear, the alleged place of public accommodation must be a physical location. In *U.S. Jaycees v. Bloomfield*, it held that a "voluntary membership organization" that "render[ed] community service" was not a place of public accommodation. 434 A.2d 1379, 1381 (D.C. 1981). The court noted that the organization "does not operate from any particular place within the District of Columbia," and instead conducts its activities through other entities. *Id.*; *accord Samuels v. Rayford*, 1995 WL 376939 at *8 (D.D.C. Apr. 10, 1995) ("Reading the definition in its entirety, therefore, a 'place of public accommodation' must: (1) be a place; and (2) be public, not private, in nature.").

The Plaintiffs' arguments to the contrary are unpersuasive. They suggest that "many Courts across the nation have expressly held internet sites to be places of 'public accommodation.'" Pls.' Opp. at 16. Maybe so. But these courts were not interpreting the D.C. Human Rights Act. *See* Pls.' Opp. at 17 (discussing cases that interpreted Title III of the Americans With Disabilities Act (the "ADA")). And courts have also held that "public accommodations" under the ADA are limited to physical spaces. *See, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995). The applicability of an unsettled interpretation about an unrelated statute is unclear.

11

The Plaintiffs also invite the Court to find that the cases interpreting the District's Human Rights Act do not apply, as they were decided before courts "had any occasion to determine the ubiquitous nature of internet-based service providers today." Pls.' Opp. at 16. The Court declines to do so. The D.C. Court of Appeals authoritatively interprets the D.C. Code, and it is not up to this Court to retire *U.S. Jaycees*. Indisputably, platforms like Facebook and Twitter have changed the ways people interact with each other, and these social media networks now permeate most aspects of our lives. But any decision to extend the coverage of existing laws to these networks must be made elsewhere. Because the Plaintiffs erroneously allege that the Platforms "qualify as public accommodations as defined by the [Act]," their claim fails.

**D.**

Lastly, the Court must also dismiss the Plaintiffs' First Amendment claim. It is axiomatic that "the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). In other words, to "trigger First Amendment protection, the infringement upon speech must have arisen from state action of some kind." *Bronner v. Duggan*, 249 F. Supp. 3d 27, 41 (D.D.C. 2017) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1002-03, (1982)).

Here, the Plaintiffs have failed to allege state action. They suggest that the Platforms are "quasi-state actors because they regulate their public platforms, thereby regulating free speech within their public forums." Am. Compl. 24. But an entity can only be a "state actor" if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The Plaintiffs do not show how the Platforms' alleged conduct may fairly be treated as actions taken by the government itself. Facebook and Twitter,

for example, are private businesses that do not become "state actors" based solely on the provision of their social media networks to the public. *See Llyod Corp. v. Tanner*, 407 U.S. 551, 569 (1972) ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.").

The Plaintiffs cite two recent cases, *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), and *Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300 (2d Cir.), *cert. granted*, 139 S. Ct. 360 (2018), in support of the proposition that "access to these social media sites could form the basis for a constitutional First Amendment issue." Pls.' Opp. at 10. Neither case applies here.

True, in *Packingham*, the Supreme Court recognized that Facebook and Twitter are among the "most important places (in a spatial sense) for the exchange of views" in society today. 137 S. Ct. at 1735. But the case involved a challenge to a *state* law that limited the speech rights of certain criminals on these platforms. *Id*. at 1738. It did not create a new cause of action against a private entity for an alleged First Amendment violation.

In *Halleck*, the Second Circuit noted that "facilities or locations deemed to be public forums are usually operated by governments," and that "determining that a particular facility or location is a public forum usually suffices to render the challenged action taken there to be state action." 882 F.3d at 306. The court found that public access television channels are public forums. *Id*. As a result, it held that private companies operating public access television channels can qualify as state actors. *Id*. at 307.

But this conclusion was based on a finding that the private companies had "a sufficient connection to governmental authority to be deemed state actors." *Id*. Specifically, the court determined that municipal authorities, who traditionally operate public access television

13

channels, had expressly "designated [the private companies] to run the public access channels." *Id*. It added that, by running the channels, the private companies were "exercising precisely the authority to administer" a public forum "conferred on them by a senior municipal official." *Id*.

Indeed, the regulatory framework of public access television channels underscores the nexus between the private providers and traditionally governmental functions. The Cable Communications Policy Act of 1984 authorizes local regulators to require that "channel capacity be designated for public, educational, or governmental use." 47 U.S.C. § 531(b). As the *Halleck* court explains, New York's Public Service Commission has long used this authority to require cable operators to "designate . . . at least one full-time activated channel for public access use." 882 F.3d at 302 (citing N.Y. Comp. Codes R. & Regs. tit. 16, § 895.4(b)(1)). The regulation requires that such channels be "designated for *noncommercial use by the public* on a first-come, first-served, nondiscriminatory basis." *Id*. (emphasis added). In other words, private cable companies are required by law to provide public access channels for the public benefit. In their absence, it would be the government that provided this service to its citizens.

By contrast, the Plaintiffs here allege no nexus between the Platforms' actions and a function traditionally reserved exclusively to the state. Nor do they contend that the Platforms were designated by the state to perform a governmental operation. Instead, the Amended Complaint focuses on the Platforms' alleged suppression of conservative political content. It details, for instance, the seemingly disparate treatment of conservative news publishers on Facebook and of conservative commentators on Twitter. Am. Compl. 4-5. But while selective censorship of the kind alleged by the Plaintiffs may be antithetical to the American tradition of

freedom of speech, it is not actionable under the First Amendment unless perpetrated by a state actor. Thus, their claim must be dismissed.[4]

**IV.**

For these reasons, the Platforms' Motion to Dismiss will be granted. A separate order accompanies this opinion.

Dated: March 14, 2019                               TREVOR N. McFADDEN, U.S.D.J.

---

[4] Because the Court finds that the Plaintiffs have failed to state valid claims, it need not address the Platforms' argument that the claims are barred by the Communications Decency Act, 47 U.S.C. § 230(c)(1).